IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CANDACE FOX, *et al.*,

               *Plaintiffs*,

v.

TRANSAM LEASING, Inc., and
TRANSAM TRUCKING, Inc.

               *Defendants*.

Case No. 12-cv-2706 CM-GLR

# MEMORANDUM ON DEFENDANTS' SUMMARY JUDGMENT MOTION

Respectfully submitted,

SEIGFREID BINGHAM, P.C.

*Counsel for Defendants*

By:    /s/ Christopher M. McHugh (19889)
        cmchugh@sb-kc.com

        Shannon D. Johnson (23496)
        sjohnson@sb-kc.com

        2323 Grand Boulevard, Suite 1000
        Kansas City, Missouri 64108
        T: (816) 265-4148
        F: (816) 343-4774

# Table of Contents

Page

Introduction ............................................................................................................ 1

    Class Action Claim.............................................................................................. 1

    Uncertified Claims ............................................................................................. 2

        (1) KCPA Claims .......................................................................................... 2

        (2) TransAm Trucking Charges ................................................................ 2

        (3) TransAm Leasing Charges.................................................................... 3

        (4) Insurance Documents .......................................................................... 3

        (5) Indemnification Provision.................................................................... 4

Statement of Uncontroverted Facts ................................................................... 4

    Parties.................................................................................................................... 4

    Settlements............................................................................................................ 5

    Satellite Communications System .................................................................... 6

    Bobtail/Deadhead and Occupational Accident Insurance ...................... 8

    Physical Damage Insurance .............................................................................. 9

    Breakdown Insurance ...................................................................................... 10

    Buy-Down............................................................................................................11

    Rider Insurance.................................................................................................. 12

    PrePass ................................................................................................................ 12

    Fuel Optimizer................................................................................................... 13

    Hand Loading..................................................................................................... 13

    Advertising ........................................................................................................ 14

        Postcard......................................................................................................... 14

        Booklet........................................................................................................... 15

Website Video ........................................................................................... 16

Points and Authorities ........................................................................................ 17

    1.  The charge for use of a satellite communications system is a charge-back item authorized by § 376.12(h) ............................................................ 17

        Damages ........................................................................................... 18

    2.  The Plaintiffs never saw the advertising they complain violates the KCPA.................................................................................................................. 19

    3.  All charges by TransAm Trucking were disclosed to the Plaintiffs in writing and accurately reflected on their settlement statements .................................... 21

        Bobtail/deadhead and occupational accident insurance ........................... 21

        PrePass ........................................................................................... 22

        Fuel optimization ......................................................................... 22

        Buy-down ....................................................................................... 22

        Rider insurance ............................................................................. 23

        Hand Loading ................................................................................ 23

    4.  All charges by TransAm Leasing were disclosed to the Plaintiffs in writing and accurately reflected on their settlement statements .................................... 23

        Physical damage insurance ............................................................. 23

        Unplanned repairs insurance ......................................................... 24

    5.  TransAm Trucking met all the requirements of § 376.12(j) governing the purchase of insurance through a carrier ...................................................... 24

    6.  Truth-in-Leasing does not bar indemnification clauses .................................. 25

Conclusion ........................................................................................................ 26

Certificate of Service ......................................................................................... 27

# Table of Authorities

<u>Page</u>

## Federal Cases

*Owner-Operator Independent Drivers Association, Inc.  v. Mayflower Transit, Inc.,* No. IP 98-458-C B/S, 2005 WL 4702006 (S.D. Ind. Sept. 26, 2005) .......... 26

*Owner-Operator Independent Drivers Association, Inc. v. Landstar System, Inc.*, 622 F.3d 1307 (11th Cir. 2010) ............................................................ 17, 18, 25

*Owner-Operator Independent Drivers Association, Inc. v. Swift Transportation Co., Inc.*, 632 F.3d 1111 (9th Cir. 2011) ................................................................ 18

## State Cases

*Finstad v. Washburn University of Topeka*, 252 Kan. 465 (1993) ............................ 19, 20

## Federal Regulations

49 C.F.R. § 376.12(i) ...................................................................................................... 5, 17, 24

49 C.F.R. § 376.12(j) ..................................................................................................... 4, 25

49 C.F.R. 376.12(h) ....................................................................................................... 2, 3, 17, 24

## Introduction

Originally, this was a 15-count class action lawsuit, asserting multiple violations of both the Kansas Consumer Protection Act (KCPA) and Federal Truth-in-Leasing law. At the certification stage, however, the Plaintiffs only requested certification on three counts, and the Court only certified one - Count 3.  This motion requests summary judgment on all counts; the one remaining class action count as well as the other 14 uncertified counts.

### Class Action Claim

TransAm Trucking, Inc. is a motor carrier.  The named Plaintiffs are independent contractor truck drivers (contractors) who agreed to provide semi-tractors and driving services to TransAm Trucking by way of an Independent Contractor Agreement (ICA). The federal regulations that govern this type of agreement are collectively called Truth-in-Leasing regulations.

TransAm Trucking has paid and continues to pay hundreds of thousands of dollars to third parties for a satellite communications system specific to semi-tractor trailers.  The system is used by TransAm Trucking's drivers (including contractors) for many things including route planning, hours-of-service logs, fuel tax reporting, monitoring the temperature of refrigerated freight, and communication with dispatch. The first page of the ICA states that $15 per week will be deducted from contractors' settlements for use of this satellite communications system.  This charge does not cover TransAm Trucking's costs for the system, which is over $25 per driver.

Count 3 asserts the charge is a "forced sale" in violation of Truth-in-Leasing. (Amended Complaint, Doc. 90 at p. 27.)  How the Plaintiffs' define "forced sale" is

unclear, as that term is not used in Truth-in-Leasing.  But "charge-back items" like the one here are mentioned, and authorized.  49 C.F.R. 376.12(h).

Even assuming some violation, the Plaintiffs cannot show any damages, which are required to survive summary judgment.

### Uncertified Claims

The uncertified claims can be separated into five categories.

*(1) KCPA Claims.*  Counts 1 and 2 assert advertising by TransAm Trucking misled the named Plaintiffs into thinking they would net $138,000 per year and were guaranteed 2,500 to 3,000 miles per week, in violation of the KCPA.  In their motion for certification (Docs. 68-69), the Plaintiffs identified the particular advertisement at issue; a video on TransAm Trucking's website.  There are actually two videos, and neither states that contractors will net $138,000 per year or are guaranteed 2,500 to 3,000 miles per week.  In fact, the ICA specifically states contractors are not guaranteed any number of miles.

Even assuming some KCPA violation, the Plaintiffs never saw the videos on TransAm Trucking's website.  That was the testimony of all three named Plaintiffs in their depositions.  And the invoices for production show the videos were not published until after the Plaintiffs had already signed ICAs in August 2011.  To maintain a claim under the KCPA, a consumer must not only show a misrepresentation existed, but also that he or she saw it and relied on it.

*(2) TransAm Trucking Charges.*  Contractors have the option of purchasing insurance through TransAm Trucking, along with other products such as a "PrePass" or fuel optimizer program.  The cost of any product or service a contractor purchases is deducted from his or her settlements.

The Plaintiffs chose to purchase some insurance through TransAm Trucking, plus a PrePass and the fuel optimizer.  And that cost was deducted from their settlements. Now, the Plaintiffs assert – in Counts 5, 7, 10, 12, 13 and 15 – these deductions were "undisclosed" charge-backs in violation of Truth-in-Leasing.  But the costs were disclosed to the Plaintiffs in writing at the time, and the deductions were clearly delineated on their settlement statements.

*(3) TransAm Leasing Charges.*  The named Plaintiffs obtained their semi-tractors from another company affiliated with TransAm Trucking called TransAm Leasing, Inc., by signing an Equipment Lease Agreement (ELA) with TransAm Leasing. In the ELA, the Plaintiffs agreed to a charge of $125 a week for physical damage insurance on the leased equipment.  Also, TransAm Leasing offers the option of unplanned repairs insurance, and the Plaintiffs chose to purchase that by signing a separate addendum to the ELA.  The Plaintiffs authorized TransAm Trucking to deduct the amounts for physical damage and unplanned repairs insurance from their settlements, by separately signing an exhibit to the ICA.

Counts 6 and 14 assert these deductions were more undisclosed charge-backs. Equipment leases are not governed by Truth-in-Leasing.  But even if they were, the costs for physical damage and unplanned repair insurance were disclosed to the Plaintiffs in writing at the time, and clearly shown on their settlement statements.

*(4) Insurance Documents.*  Counts 8, 9 and 11 assert TransAm Trucking violated 49 C.F.R. § 376.12(h), the regulation on charge-back items, by failing to provide copies of documents and other information about the amounts it charged for the insurance the Plaintiffs chose to purchase through TransAm Trucking.  Section 376.12(h) does not apply to purchases of insurance.  "[I]nsurance coverage for operation

3

of the leased equipment [purchased] from or through the authorized carrier" is covered by a different regulation, 49 C.F.R. § 376.12(j).  And TransAm Trucking complied with all its requirements.

**(5)** *Indemnification Provision.*  Contractors agree in the ICA to indemnify TransAm Trucking up to a certain amount for any injury or damage to personal property the contractor might cause, and for which TransAm Trucking might be liable.  Count 4 asserts this indemnification provision is somehow illegal under Truth-in-Leasing.  But nothing in the law bars indemnification clauses.

Accordingly, TransAm Trucking and TransAm Leasing are entitled to summary judgment on all counts.

## Statement of Uncontroverted Facts

### Parties

1.    TransAm Trucking is an interstate and intrastate for-hire motor carrier (US DOT No. 315503, Docket No. MC-197897).  (Affidavit of Murray Droescher, Ex. A at 4.)

2.    TransAm Trucking "leases" (as that term is defined by Truth-in-Leasing regulation) semi-tractors and driving services from contractors by entering into an ICA with each contractor.  (Droescher Affidavit, Ex. A at 5.)

3.    The ICA states:

> Contractor owns and/or leases motor vehicle equipment and is engaged in the business of transporting freight by motor vehicle pursuant to long term arrangements with for-hire motor carriers; and ... [TransAm Trucking] desires to lease Contractor's motor vehicle equipment and to obtain certain personnel services from Contractor from time to time, and Contractor desires to lease such motor vehicle equipment to [TransAm Trucking] and to make available such personnel services from time to time ...

(ICAs, Ex. B at 1.)

4.    The contractor agrees to:

4

> [F]urnish to [TransAm Trucking] the motor vehicle equipment .... for the purpose of hauling freight from time to time pursuant to the terms and conditions of this Agreement. Such Equipment shall be furnished to [TransAm Trucking] on a schedule to be determined by Contractor.

(ICA, Ex. B at 1.)

5.     A separate ICA is signed for each semi-tractor a contractor leases to Trans-Am Trucking.  (Droescher Affidavit, Ex. A at 6.)

6.     The ICA states contractors:

> shall determine the method, means and the manner of performing Contractor's obligations pursuant to this Agreement and shall be responsible to [TransAm Trucking] for the performance of this Agreement in accordance with the rules and regulations of appropriate regulatory agencies.

(ICA, Ex. B at 20.)

7.     As required by Truth-in-Leasing regulation 49 C.F.R. § 376.12(i), the ICA states, "Contractor is not required to purchase or rent any products, equipment, or services from Carrier or Carrier's affiliates as a condition of this Agreement."  (ICA, Ex. B at 18.)

8.     All the named Plaintiffs signed ICAs in August 2011.  (ICAs, Ex. B, C and D.)

9.     The named Plaintiffs obtained their semi-tractors from another company affiliated with TransAm Trucking called TransAm Leasing, Inc., by entering into an ELA with TransAm Leasing.  (ELAs, Ex. E, F and G.)

10.   Equipment leases are not governed by Federal Truth-in-Leasing regulations.

## Settlements

11.   TransAm Trucking contractors are paid by settlements.  (Deposition of Murray Droescher, Sept. 9, 2013, Ex. H at 105-106.)

12.   Settlement statements show revenue for all trip paperwork turned in the previous week.  (Droescher Deposition, Sept. 9, 2013, Ex. H at 105-106.)

13.   As to settlements, the ICA states:

In consideration for furnishing the Equipment and the provision of the personnel services as specified herein, [TransAm Trucking] shall pay to Contractor the compensation described in Exhibit C ...  All such payments to Contractor and any applicable deductions shall be reflected in an operator's settlement which [TransAm Trucking] shall produce both on a weekly basis and as a final statement following termination of this Agreement ("Settlement")...

(ICA, Ex. B, at 3.)

14.   In the ICA, Contractors authorize certain deductions from their settlements, including for any insurance or other products they choose to purchase through TransAm Trucking.  (ICA, Ex. B at 1, 4, 9, 14, 15.)

15.   All deductions are clearly enumerated on settlement statements.  (Droescher Affidavit, Ex. A at ¶ 7; Settlement Statement, Ex. I; Report of John Pinckney, Ex. J at 9.)

16.   The Plaintiffs hired an expert to opine on any Truth-in-Leasing violations by TransAm Trucking, and he could not identify any charge in any settlement statement not specified in the ICA.  (Pinckney Report, Ex. J at 9; Deposition of Whitney Morgan, Ex. K at 28-31.)

## Satellite Communications System

17.   TransAm Trucking has paid and continues to pay hundreds of thousands of dollars to third parties for a satellite communications system specific to semi-tractor trailers.  (Droescher Affidavit, Ex. A at 8.)

18.   The system is used by TransAm Trucking's drivers (including contractors) to effectively and efficiently plan routes; verify compliance with Federal Motor Carrier Safety Regulations (FMCSRs) on, among other things, hours of service; automate fuel tax reporting; monitor the temperature of refrigerated loads; and communicate with

dispatch, particularly when ready for duty, accepting a load, loading, or unloading. (Droescher Affidavit, Ex. A at 9; Pinckney Report, Ex. J at 10.)

19.   The first page of the ICA states $15 per week will be deducted from a contractor's settlements for use of the satellite communications system:

> Contractor shall pay to Carrier a satellite communications system usage fee in the amount of fifteen dollars ($15.00) per week.  Carrier may deduct any and all such amounts payable by Contractor under this subparagraph 1(b) from the compensation otherwise payable to Contractor hereunder.

(ICA, Ex. B at 1(b).)

20.   The ICA states further:

> Contractor expressly acknowledges and agrees that Carrier may deduct from the compensation otherwise payable to Contractor pursuant to paragraph 3 hereof amounts sufficient to cover Contractor's payment obligations as specified in this Agreement, as well as any other amounts specifically directed and authorized by Contractor. Carrier will not make any deductions from Contractor's compensation hereunder for any charge-back item unless the item is clearly specified in this Agreement (including separate documents which are incorporated herein by reference).  Contractor specifically authorizes carrier to make deductions for the following items: ...

> (b)    charges related to Carrier's satellite communications unit, if applicable, and the satellite communications system usage fee described in paragraph 1(b) ...

(ICA, Ex. B at 15.)

21.   The cost to TransAm Trucking for the satellite communications system exceeds the $15 per week deducted from settlements.  While it varies, the actual cost is approximately $25 or more per week per driver.  (Deposition of Murray Droescher, Nov. 3, 2014, Ex. L at 11-12, 15-18, 25-26.)

22.   TransAm Trucking decided on $15 per week based on market conditions, not its costs.  (Droescher Deposition, Nov. 3, 2014, Ex. L at 11-12.)

23.  The $15 per week charge for use of the satellite communications system is clearly set out in settlement statements.  (Droescher Affidavit, Ex. A at 10; Settlement Statement, Ex. I.)

### Bobtail/Deadhead and Occupational Accident Insurance

24.  The ICA states TransAm Trucking will provide public liability insurance:

> Pursuant to FMCSA regulations under 49 U.S.C. 13906, [TransAm Trucking] shall maintain, at its own expense, public liability and property damage insurance coverage or self-insurance for the protection of the public.

(ICA, Ex. B at 9.)

25.  The ICA also states:

> Contractor acknowledges and agrees that if Contractor (or any agent or employee of Contractor) is responsible for an accident resulting in loss or damage to third parties and/or their property (i.e., public liability) while operating the Equipment under this Agreement, then Contractor shall pay up to and including the sum of Two Thousand Dollar ($2,000) for such public liability, including property damage, bodily injury and/or environmental restoration.

(ICA, Ex. B at 9.)

26.  Contractors are required to provide their own bobtail/deadhead insurance and occupational accident insurance.  (ICA, Ex. B at 9.)

27.  Contractors are not required to purchase this insurance through TransAm Trucking.  The ICA states:

> Contractor shall have the option of either independently contracting for the insurance required under this paragraph 9, or requesting [TransAm Trucking] to obtain such coverage in Contractor's name and charge such costs to Contractor.  In the event Contractor chooses the latter option, [TransAm Trucking] will provide Contractor with a certificate of insurance for each such policy ...  If applicable, the specific amount to be charged for such insurance coverage will be attached hereto as EXHIBIT B and incorporated herein by reference, and [TransAm Trucking] may deduct such amounts from the compensation otherwise payable to Contractor hereunder.

(ICA, Ex. B at 9.)

28.  Contractors have the option of purchasing bobtail/deadhead and occupational accident insurance through TransAm Trucking.  (ICA Addendum, Ex. M.)

29.  The cost of obtaining bobtail/deadhead insurance and occupational accident insurance through TransAm Trucking is clearly set out in an exhibit to the ICA.  (Exhibit B to the ICA, Ex. B.)

30.  The named Plaintiffs chose to purchase bobtail/deadhead and occupational accident insurance through TransAm Trucking by separately signing an addendum to the ICA.  (ICA Addendums, Ex. M, N and O.)

31.  The addendum states, "I understand that I am not required to purchase this, or any item or product from TransAm Trucking, Inc."  (ICA Addendum, Ex. M.)

32.  The cost for bobtail/deadhead and occupational accident insurance was deducted from the Plaintiffs' settlements, and those deductions were accurately reflected on the Plaintiffs' settlement statements.   (Droescher Affidavit, Ex. A at 11; Settlement Statement, Ex. I.)

## Physical Damage Insurance

33.  In the ELA, the Plaintiffs agreed to a charge of $125.00 per week for "collision, fire and theft (physical damage) insurance coverage on the Equipment."  (ELAs, Ex. E, F and G at 19.)

34.  The Plaintiffs authorized TransAm Trucking to deduct this amount from their settlements, by separately signing and dating an exhibit to the ICA.  (Exhibit D to the ICA, Ex. B.)

35.  This exact amount was deducted from the Plaintiffs' settlements, and that deduction was clearly shown on the Plaintiffs' settlement statements.   (Droescher Affidavit, Ex. A at 12; Settlement Statement, Ex. I.)

### Breakdown Insurance

36.  TransAm Leasing offers the option of insurance for unplanned repairs, also called "breakdown" insurance.  (Brochure, Ex. P.)

37.  Breakdown insurance supplies another semi-tractor while unplanned repairs are completed so a contractor can continue to earn income, and also covers the contractors' lease payments while his own truck is out of service.  (Brochure, Ex. P.)

38.  TransAm Leasing does not require anyone to purchase breakdown insurance.  (ELA, Ex. E.)

39.  The named Plaintiffs chose to purchase breakdown insurance by separately signing an addendum to the ELA.  (ELA Addendums, Ex. Q, R and S.)

40.  The price for breakdown insurance was clearly set out in two documents given to the Plaintiffs; a brochure, and a document titled "Escrow – Optional Increases." (Brochure, Ex. P; Optional Increases, Ex. T.)

41.  In fact, handwritten calculations by one of the Plaintiffs, Anthony Gillespie, on his copy of the Optional Increases document include the amount for breakdown insurance.  (Handwritten Calculations on Optional Increases, Ex. T.)

42.  The Plaintiffs authorized TransAm Trucking to deduct the cost for breakdown insurance from their settlements, by separately signing and dating an exhibit to the ICA, (Deduction and Remittance Requests, Ex. E, F and G.)

43.  That cost was deducted from the Plaintiffs' settlements, and those deductions were accurately reflected on the Plaintiffs' settlement statements.  (Droescher Affidavit, Ex. A at 13; Settlement Statement, Ex. I.)

### Buy-Down

44.  In the ICA, contractors agree to indemnify TransAm Trucking up to a certain amount for injury or property damage the contractor may cause, and for which TransAm Trucking may be liable.  (ICA, Ex. B at 9.)

45.  TransAm Trucking allows contractors to lower that indemnification amount by "buying down" the amount.  (ICA Addendum, Ex. M.)

46.  TransAm Trucking does not require contractors to buy down their indemnification.  (ICA, Ex. B; ICA Addendum, Ex. M.)

47.  The named Plaintiffs chose to buy down their indemnification by separately signing an addendum to the ICA.  (ICA Addendums, Ex. M, N and O.)

48.  The cost for the buy-down was clearly listed in a document given to the Plaintiffs called "Escrow - Optional Increases."  (Optional Increases, Ex. T.)

49.  In fact, handwritten calculations by one of the Plaintiffs, Anthony Gillespie, on his copy of the Optional Increases document include the amount for the buy-down option.  (Handwritten Calculations on Optional Increases, Ex. T.)

50.  The cost of the buy-down was deducted from the Plaintiffs' settlements, and those deductions were accurately reflected on the Plaintiffs' settlement statements.  (Droescher Affidavit, Ex. A at 14; Settlement Statement, Ex. I.)

**Rider Insurance**

51.   The Amended Complaint asserts TransAm Trucking charged the named Plaintiffs for rider insurance, and that charge was an undisclosed charge-back item in violation of Truth-in-Leasing regulations.  (Amended Complaint, Doc. 90 at p. 37-38.)

52.   None of the named Plaintiffs opted to purchase rider insurance through TransAm Trucking, and no charge for rider insurance appears on the Plaintiffs' settlement statements.  (Droescher Affidavit, Ex. A at 15.)

**PrePass**

53.   TransAm Trucking offers contractors the option of purchasing a "PrePass" service, which allows their semi-tractors to bypass highway scales, and allows the automated payment of tolls.  (Droescher Affidavit, Ex. A at 16.)

54.   TransAm Trucking does not require anyone to purchase a PrePass.  (ICA, Ex. B.)

55.   The Plaintiffs chose to purchase a PrePass through TransAm Trucking by separately signing a "PrePass Authorization" form.  (PrePass Authorizations, Ex. U, V and W.)

56.   The PrePass Authorization clearly states that PrePass is an "optional" service costing $3.40 per week.  (PrePass Authorization, Ex. U.)

57.   The PrePass Authorization also states, "I understand that I am not required to purchase this service from TransAm Trucking, Inc."  (PrePass Authorization, Ex. U.)

58.   The cost for PrePass was deducted from the Plaintiffs' settlements, and the deduction was clearly set forth on their settlement statements.  (Droescher Affidavit, Ex. A at 17; Settlement Statement, Ex. I.)

**Fuel Optimizer**

59.  TransAm Trucking offers contractors the option of purchasing a fuel optimization program.  (Fuel Optimizer Authorization, Ex. X.)

60.  The fuel optimization program helps contractors maximize fuel efficiency by advising them when and where to fuel their semi-tractors.  (Droescher Affidavit, Ex. A at 18.)

61.  TransAm Trucking does not require anyone to purchase this program.  (ICA, Ex. B.)

62.  The named Plaintiffs chose to purchase the fuel optimization program by separately signing a Fuel Optimizer Authorization.  (Fuel Optimizer Authorizations, Ex. X, Y and Z.)

63.  The Fuel Optimizer Authorization states it is an "optional" service that costs $3.00 per week.  (Fuel Optimizer Authorization, Ex. X.)

64.  The Fuel Optimizer Authorization also states, "I understand that I am not required to purchase this service from TransAm Trucking, Inc."   (Fuel Optimizer Authorization, Ex. X.)

65.  The cost for the fuel optimizer program was deducted from the named Plaintiffs' settlements, and the deduction was clearly set out on their settlement statements.  (Droescher Affidavit, Ex. A at 19; Settlement Statement, Ex. I.)

**Hand Loading**

66.  The Plaintiffs claim TransAm Trucking deducted amounts from their settlements for "hand loading," and this deduction constituted an undisclosed charge-back in violation of Truth-in-Leasing regulations.  (Amended Complaint, Doc. 90 at p. 43-44.)

67.  "Handload" or "HL" is an accounting term for manually advancing funds to a contractor.  (Droescher Affidavit, Ex. A at 20.)

68.  TransAm Trucking advanced funds to the Plaintiffs on their request, and when those funds were later deducted from a settlement, the deduction item was called a "handload" or "HL" on the Plaintiffs' settlement statements.  (Droescher Affidavit, Ex. A at 21.)

69.  The deduction of previously advanced funds from a settlement is specifically authorized by the ICA.  (ICA, Ex. B at 14, 15.)

## Advertising

70.  In their depositions, the named Plaintiffs testified they, collectively, only saw two pieces of TransAm Trucking advertising; a postcard, and an advertisement in a booklet at truck-stops.

### *Postcard*

71.  Copies of the postcards sent to prospective drivers at the time the Plaintiffs contracted with TransAm Trucking are attached as Exhibits AA, BB, and CC.

72.  The postcards do not contain any representation or promise that contractors will drive 2,500 to 3,000 miles per week or receive a net income of $138,000 per year.  (Postcards, Ex. AA, BB and CC.)

73.  The ICA affirmatively states there is no guarantee as to the number of miles a contractor might drive per week.  (ICA, Ex. B at 2(a).)

74.  TransAm Trucking's contractors drive, on average, between 2,500 and 3,000 miles per week.  (TransAm Trucking's Answers to Interrogatories, Ex. DD at 8.)

75.  Anthony Gillespie produced a postcard in discovery, but it was dated in May 2012, after he stopped driving for TransAm Trucking.  (Gillespie Postcard, Ex. EE.)

76.  Charles Schreckenbach also produced a postcard in discovery, but it was postmarked in March 2012, after he stopped driving for TransAm Trucking. (Schreckenbach Postcard, Ex. FF.)

77.  The postcards sent to Anthony Gillespie and Charles Schreckenbach (after they left TransAm Trucking) both stated, "Owner operators *gross* an average of $138,000 per year."   (Gillespie Postcard, Ex. EE; Schreckenbach Postcard, Ex. FF) (emphasis added).

78.  Contractors at TransAm Trucking gross more than $138,000 per year on average.  The average annual gross income for contractors for each year between 2009 and 2012 was:

            2009:  $170,872
            2010:  $180,028
            2011:  $180,286
            2012:  $177,771

(TransAm Trucking's Answers to Interrogatories, Ex. DD at 6.)

79.  The Internal Revenue Service Form 1099s for the named Plaintiffs demonstrate their annualized gross income exceeded $138,000 while they were driving for TransAm Trucking.  (1099s, Ex. GG; Annualized Income Figures, Ex. HH.)

*Booklet*

80.  A copy of the "booklet ad" in circulation at the time the named Plaintiffs contracted with TransAm Trucking is attached as Exhibit II.

81.  In her deposition, Candace Fox testified she only saw one TransAm Trucking advertisement and it was a "booklet" ad.  (Deposition of Candace Fox, Ex. JJ at 124-25.)

15

82. Anthony Gillespie and Charles Schreckenbach also testified they saw the booklet ad. (Deposition of Anthony Gillespie, Exhibit KK at 73-75; Deposition of Charles Schreckenbach, Exhibit LL at 52-54, 57-58.)

83. The booklet ad says nothing about driving 2,500 to 3,000 miles a week or receiving a net income of $138,000. (Booklet Ad, Ex. II.)

*Website Video*

84. According to their deposition testimony, the named Plaintiffs did not view TransAm Trucking's website before deciding to contract with TransAm Trucking. (Fox Deposition, Ex. JJ at 106; Gillespie Deposition, Ex. KK at 107; Schreckenbach Deposition, Ex. LL at 58.)

85. The website contains two videos. (www.transamtruck.com.)

86. In one video, a driver in an interview states, "*I* average between 2500 and 3000 miles a week." (See "What makes TransAm Trucking a great choice for drivers?" at www.transamtruck.com).

87. TransAm Trucking's head of marketing, Rhonda McFarland, testified in her deposition that this comment was unscripted. (Deposition of Rhonda McFarland, Ex. MM at p. 154-59.)

88. Neither video contains any representation or promise about net income. (www.transamtruck.com.)

89. Neither video was published until after the named Plaintiffs had already contracted with TransAm Trucking in August 2011. The invoices for creating the videos show one was not published until after September 2011 and the other after July 2012. (Production Invoices, Ex. NN.)

Points and Authorities

**1. The charge for use of a satellite communications system is a charge-back item authorized by § 376.12(h).**

On the front page of the ICA, contractors agree to "a satellite communications system usage fee in the amount of fifteen dollars ($15.00) per week." (ICA, Ex. B at 1(b).)   Count 3 asserts this is a "forced purchase" in violation of Truth-in-Leasing regulation 49 C.F.R. § 376.12(i), which states:

> The written lease required under § 376.11(a) shall contain the following provisions ...
>
> The lease shall specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement.

The ICA here fully complies with § 376.12(i).  Paragraph 18 states, "Contractor is not required to purchase or rent any products, equipment or services from Carrier or Carrier's affiliates as a condition of this Agreement." (ICA, Ex. B at 18.)

Moreover, charge-back items like this one are not barred by Truth-in-Leasing but are specifically authorized.  49 C.F.R. § 376.12(h) states:

> Charge-back items.  The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed.  ...

TransAm Trucking's costs well exceed the $15 it charged contractors for use of the satellite communications system.  But even with a profit margin, the satellite charge would still constitute a charge-back item.  Truth-in-Leasing law allows profit on charge-back items.  *Owner-Operator Independent Drivers Association, Inc. v. Landstar System, Inc.*, 622 F.3d 1307, 1319 (11th Cir. 2010) (ruling motor carrier may profit from charge-back and need not reveal its profit on a flat-fee charge-back); *Owner-Operator*

17

*Independent Drivers Association, Inc. v. Swift Transportation Co., Inc.*, 632 F.3d 1111, 1118 (9th Cir. 2011).

**Damages.**   Even assuming a technical violation, the Plaintiffs cannot show damages, which is required to survive summary judgment.  *Landstar*, 622 F.3d at 1325 (affirming summary judgment in part on failure to show damages from violation of Truth-in-Leasing); *Swift*, 632 F.3d at 1122 (affirming summary judgment).

Here, the Plaintiffs argue they are entitled to restitution of the entire $15 charge. That is plainly wrong.  Neither restitution nor disgorgement of profits is available in a Truth-in-Leasing case.  *Landstar*, 622 F.3d at 1324 ("restitution and disgorgement are unavailable under the Act"); Swift, 632 F.3d at 1121.  Accordingly, it is not enough to simply demand the return of an entire amount charged or even demonstrate the amount of profit in a charge.  *Landstar*, 622 F.3d at 1326; *Swift*, 632 F.3d at 1122 ("Since the mere act of charging a mark-up does not violate the regulations, Plaintiffs cannot prove damages simply by showing that Swift sometimes charged more than its actual costs for charge-backs").

Instead, the Plaintiffs must show some difference between the amount charged by TransAm Trucking and a lower market rate.  In other words, "Plaintiffs must show that, but for the violation, they would have made different choices, and, thereby, saved money."  *Landstar*, 622 F.3d at 1325 (quoting defendant's brief).  That is not possible in this case because TransAm Trucking set its rate based on the market.[1]

---

[1] Further, it is not as if a contractor could choose to drive for TransAm Trucking but purchase access to the satellite communications system separately from a third party.   Satellite communications systems for semi-tractor trailers cost hundreds of thousands of dollars and are purchased by motor carriers for use by their drivers.

**2.  The Plaintiffs never saw the advertising they complain violates the KCPA.**

Counts 1 and 2 assert TransAm Trucking misled the named Plaintiffs into think-ing they would net $138,000 per year and were guaranteed 2,500 to 3,000 miles per week, in violation of the KCPA.  In their motion for certification, the Plaintiffs identified the specific piece of advertising at issue: a video on TransAm Trucking's website.

The video does not say a contractor will net $138,000 per year or is guaranteed 2,500 to 3,000 miles per week.  There are actually two videos.  Neither says anything about net income.  In one video, a driver in an interview states, "*I* average between 2500 and 3000 miles a week."   (See "What makes TransAm Trucking a great choice for drivers?" at www.transamtruck.com.)   But that cannot be reasonably construed as a promise or guarantee.   It was an unscripted comment in an interview of a driver. (McFarland Deposition, Ex. MM at 154-159.)   And the ICA itself states, "There is no guarantee by Carrier to Contractor of a minimum number of miles available pursuant to this Agreement."[2]  (ICA, Ex. B at 2(a).)

Even if the videos did somehow violate the KCPA, the Plaintiffs never saw them before deciding to contract with TransAm Trucking in August 2011.   That was the Plaintiffs' testimony in their depositions.   And the invoices for creation of the videos show one was not published until after September 2011 and the other after July 2012. (Production Invoices, Ex. NN.)

A person complaining about an advertisement he or she did not even see cannot maintain an action under the KCPA.  The Kansas Supreme Court's decision in *Finstad v. Washburn University of Topeka* is on point.  252 Kan. 465 (1993).  *Finstad* was a KCPA

---

[2] Contractors at TransAm Trucking do in fact average between 2,500 and 3,000 miles a week.  (TransAm Trucking's Answers to Interrogatories, Ex. DD at 8.)

case brought by Washburn University students against the University for what the students claimed were false statements in a course catalog. The district court granted summary judgment to the University and the students appealed. The Supreme Court affirmed the dismissal. It determined the students were not "aggrieved" consumers under the KCPA, thus without standing, because none could show they relied on the statements in the course catalog, and many could not even show they saw the statements:

> In the present case, the students did not rely on the false statement, and many, if not all, of the students were unaware of the statement. Many enrolled prior to the publication of the statement in the university cata-logue. Nor is there any showing that any of the students suffered injury or loss as a result of the publication of the statement.

*Finstad*, 525 Kan. at 472. There is no meaningful distinction between *Finstad* and the instant case.

There are other advertising materials the Plaintiffs claim they did see; postcards and an advertisement in a "booklet" at truck stops. But none of those have anything about net income or a guarantee of 2,500 to 3,000 miles a week either. Anthony Gillespie and Charles Schreckenbach produced some postcards in discovery (postmarked after they left TransAm Trucking) that state, "Owner operators *gross* an average of $138,000 per year." (Gillespie Postcard, Ex. EE; Schreckenbach Postcard, Ex. FF) (emphasis added). But there is no representation as to net income. And contractors do "gross an average of $138,000 per year." The average annual gross income for contractors for each year between 2009 and 2012 was:

        2009:    $170,872
        2010:    $180,028
        2011:    $180,286
        2012:    $177,771

(TransAm Trucking's Answers to Interrogatories, Ex. DD at 6.)   In fact, using the numbers from the IRS 1099 forms issued to the Plaintiffs by TransAm Trucking, the gross income for each of them would have exceeded $138,000 had they worked for a year.  (1099s, Ex. GG; Annualized Income Figures, Ex. HH.)

### 3.  All charges by TransAm Trucking were disclosed to the Plaintiffs in writing and accurately reflected on their settlement statements.

Contractors have the option of purchasing insurance and other products through TransAm Trucking.   The Plaintiffs chose to purchase bobtail/deadhead insurance, occupational accident insurance, a "PrePass" and fuel optimization program.   Amounts for these products and services were deducted from the Plaintiffs' settlements and accurately reflected on their settlement statements.   Counts 5, 7, 10, 12, 13 and 15 now assert these deductions were undisclosed charge-backs.

Optional purchases are not charge-back items.   But even if these deductions could be considered charge-backs, they were fully disclosed.

***Bobtail/deadhead and occupational accident insurance.***   The cost of obtaining bobtail/deadhead insurance and occupational accident insurance through TransAm Trucking was disclosed to the Plaintiffs in an exhibit attached to the ICA.  (Exhibit B to the ICA, Ex. B.)  The exhibit states bobtail/deadhead insurance costs $6 per week and occupational accident insurance costs $22.85 per week.  The Plaintiffs chose to purchase bobtail/deadhead and occupational accident insurance through TransAm Trucking by separately signing, initialing and dating an addendum to the ICA.  (ICA Addendums, Ex. M, N and O.)  The addendum states, "I understand that I am not required to purchase this, or any item or product from TransAm Trucking, Inc."

*PrePass.*  A PrePass allows a semi-tractor to bypass highway scales, and allows the automated payment of tolls.  The Plaintiffs chose to purchase PrePasses through TransAm Trucking by separately signing and dating a "PrePass Authorization." (PrePass Authorizations, Ex. U, V and W.)  The authorization states a PrePass costs $3.40 per week.  (PrePass Authorization, Ex. U.)   It also states, "I understand that I am not required to purchase this service from TransAm Trucking, Inc."   (PrePass Authorization, Ex. U.)

*Fuel optimization.*  TransAm Trucking's fuel optimization program helps contractors maximize fuel efficiency by advising them when and where to fuel.  The Plaintiffs chose to purchase the fuel optimization program by separately signing and dating a "Fuel Optimizer Authorization."  (Fuel Optimizer Authorizations, Ex. X, Y and Z.)  The authorization states the fuel optimization program costs $3 per week.  (Fuel Optimizer Authorization, Ex. X.)  It also states, "I understand that I am not required to purchase this service from TransAm Trucking, Inc."  (Ex. X.)

*Buy-down*.  In the ICA, contractors agree to indemnify TransAm Trucking up to a certain amount for injury or property damage the contractor may cause, and for which TransAm Trucking may be liable.   (ICA, Ex. B at 9.)   TransAm Trucking gives contractors the option to "buy-down" that indemnification to a lower amount.   A document titled "Escrow – Optional Increases" states the cost of buying-down the indemnification is $19.85 per week.   (Optional Increases, Ex. T.)   Handwritten calculations by Anthony Gillespie on the Optional Increases document include the $19.85 for buying down his indemnification.  (Optional Increases, Ex. T.)  The Plaintiffs chose to buy-down their indemnification by separately signing, initialing and dating an addendum to the ICA.  (ICA Addendums, Ex. M, N and O.)  The addendum states, "I

understand that I am not required to purchase this, or any item or product from TransAm Trucking, Inc."

**Rider insurance.**  The Amended Complaint asserts TransAm Trucking charged the Plaintiffs for rider insurance, and that charge was an undisclosed charge-back.  But none of the Plaintiffs opted to purchase rider insurance through TransAm Trucking, and they were not charged for it.  (Droescher Affidavit, Ex. A at 15.)

**Hand Loading.**  The Amended Complaint also asserts TransAm Trucking charged for "hand loading," and that was another undisclosed charge-back.  Hand loading or "HL" is an accounting term for manually advancing funds to a contractor per his or her request.  (Droescher Affidavit, Ex. A at 20.)  The only deduction associated with hand loading is the deduction of previously advanced funds, which is expressly authorized by the ICA.  (ICA, Ex. B at 14, 15.)

**4. All charges by TransAm Leasing were disclosed to the Plaintiffs in writing and accurately reflected on their settlement statements.**

In the ELA with TransAm Leasing, the Plaintiffs agreed to a charge of $125 for physical damage insurance.  They also chose the option of purchasing unplanned repairs insurance.  Counts 6 and 14 assert these deductions were more undisclosed chargebacks.  Equipment leases are not governed by Truth-in-Leasing.  But even if they were, the amounts for physical damage and unplanned repair insurance were disclosed to the Plaintiffs in writing and accurately reflected on their settlement statements.

**Physical damage insurance.**  The ELAs signed by the Plaintiffs state the cost of "collision, fire and theft (physical damage) insurance coverage on the Equipment" is $125 per week.  (ELA, Ex. E at 19.)  The Plaintiffs authorized TransAm Trucking to

deduct this amount from their settlements by separately signing an exhibit to the ICA, (Exhibit D to the ICA, Ex. B) pursuant to 49 C.F.R. § 376.12(i).[3]

***Unplanned repairs insurance.***  Unplanned repairs insurance supplies a replacement truck while repairs are completed, and also covers a contractor's lease payments while his semi-truck is out of service.  (Brochure, Ex. P.)  Two documents, a brochure and the Optional Increases document, both stated the cost of unplanned repair insurance was $7.50 per week.   (Brochure, Ex. P; Optional Increases, Ex. T.)  Handwritten calculations by Anthony Gillespie on the Optional Increases document include the $7.50 for unplanned repairs insurance.  (Optional Increases, Ex. T.)  The Plaintiffs chose to purchase unplanned repairs insurance by separately signing an addendum to the ELA.  (ELA Addendums, Ex. E, F and G.)  The addendum states, "I understand that I am not required to purchase this, or any item or product from TransAm Leasing, Inc."

### 5.  TransAm Trucking met all the requirements of § 376.12(j) governing the purchase of insurance through a carrier.

Counts 8, 9 and 11 claim TransAm Trucking violated § 376.12(h), the regulation on charge-back items, by failing to "afford" copies of documents and other information about the amounts it charged for the insurance the Plaintiffs chose to purchase through TransAm Trucking.   Section 376.12(h) does not apply to insurance purchases. [I]nsurance coverage for operation of the leased equipment [purchased] from or

---

[3] Section 376.12(i) allows deductions from a settlement for amounts due an equipment lease company.  It states:

> The lease shall specify the terms of any agreement in which the lessor is a party to an equipment purchase or rental contract which gives the authorized carrier the right to make deductions from the lessor's compensation for purchase or rental payments.

through the authorized carrier" is covered by a different regulation, § 376.12(j).  And

TransAm Trucking complied with all its requirements.

> Section 376.12(j) states:

> If the lessor purchases any insurance coverage for the operation of the leased equipment from or through the authorized carrier, the lease shall specify that the authorized carrier will provide the lessor with a copy of each policy upon the request of the lessor.  Also, where the lessor purchases such insurance in this manner, the lease shall specify that the authorized carrier will provide the lessor with a certificate of insurance for each such policy.  Each certificate of insurance shall include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to the lessor for each type of coverage, and the deductible amount for each type of coverage for which the lessor may be liable.

TransAm Trucking complied with all of these requirements.  There is no allega-

tion otherwise.  The ICAs signed by the Plaintiffs state:

> In the event Contractor chooses [to purchase insurance through Carrier], Carrier will provide Contractor with a certificate of insurance for each such policy, as required by49 CFR §376.12.  Carrier will also provide Contractor with a copy of each such policy upon request of Contractor.

(ICA, Ex. B at 9.)[4]

### 6.  Truth-in-Leasing does not bar indemnification clauses.

Count 4 argues the indemnification of TransAm Trucking by the Plaintiffs for

damages to a third party caused by the Plaintiffs is a violation of § 376.12(j)(2).  Section

376.12(j)(2) does not bar indemnity.  It simply states, in relevant part:

> The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. § 13906.  ...

The ICA signed by the Plaintiffs meets this requirement exactly.  It states:

---

[4] Even were § 376.12(h) to apply, the Plaintiffs are misreading it.  There is no requirement to supply any documents for a flat fee charge-back.  All that is required is the amount of the charge-back item be disclosed to the contractor and accurately reflected on his or her settlement statement.  *Landstar*, 622 F.3d at 1320.

> Pursuant to FMCSA regulations under 49 U.S.C. § 13906, Carrier shall maintain, at its own expense, public liability and property damage insurance coverage or self-insurance for the protection of the public.

(ICA, Ex. B at 9.)

> The ICA goes on to state:

> Contractor acknowledges and agrees that if Contractor (or any agent or employee of Contractor) is responsible for an accident resulting in loss or damage to third parties and/or their property (i.e., public liability) while operating the Equipment under this Agreement, then Contractor shall pay up to and including the sum of Two Thousand Dollar ($2,000) for such public liability, including property damage, bodily injury and/or environmental restoration.

(ICA, Ex. B at 9.)   And nothing in in the law, including § 376.12(j)(2), prevents or prohibits that indemnity.  TransAm Trucking must maintain public liability insurance, but there is no bar to it recouping some of that cost.  In fact, TransAm Trucking could even charge-back to contractors the premiums.  *Owner-Operator Independent Drivers Association, Inc.  v. Mayflower Transit, Inc.,* No. IP 98-458-C B/S, 2005 WL 4702006 (S.D. Ind. Sept. 26, 2005).

## Conclusion

The one class-action claim, and the 14 other uncertified claims by the Plaintiffs, fail as a matter of law.  Thus, TransAm Trucking and TransAm Leasing are entitled to summary judgment on all counts.

Dated:  December 22, 2014.

Respectfully submitted,

SEIGFREID BINGHAM, PC

*Counsel for Defendants*

By:    /s/ Christopher M. McHugh (19889)
cmchugh@sb-kc.com

Shannon D. Johnson (23496)
sjohnson@sb-kc.com

2323 Grand Boulevard, Suite 1000
Kansas City, Missouri 64108
T: (816) 265-4148
F: (816) 343-4774

## Certificate of Service

On December 22, 2014, a copy of the foregoing was filed using the Clerk of the

Court's CM/ECF system, which will send a copy to:

Gregory Forney at gforney@slslaw.com
Anne Smith at asmith@sls-lqw.com
Daniel Runion at drunion@sls-law.com
Richard Lombardo at rlombardo@sls-law.com
and    Greg Leyh at gleyh@leyhlaw.com

By:    /s/ Christopher M. McHugh